UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TRACEY WILLIAMS, | |
| Plaintiff, | |
| v. | Case No. 3:21-CV-892 JD |
| WHITLEY MEMORIAL HOSPITAL, INC. D/B/A PARKVIEW WARSAW MEDICAL COMPLEX, et al., | |
| Defendants. | |

**OPINION AND ORDER**

The Defendants, Whitley Memorial Hospital, Inc. d/b/a Parkview Warsaw Medical

Complex and Parkview Health Systems, Inc. (collectively "Parkview"), have moved for

summary judgment on the Plaintiff, Tracey Williams', claims under Title VII of the Civil Rights

Act of 1964, the Health Insurance Portability and Accountability Act (HIPAA), the Emergency

Medical Treatment and Active Labor ACT (EMTALA), and the Anti-Kickback Act (AKA). (DE

20.) Parkview has also moved to strike some of the evidence Ms. Williams has marshalled in her

response to the motion. (DE 32.)

Ms. Williams has brought three claims against Parkview under Title VII, a hostile work

environment claim (Count I), a sex discrimination claim (Count II), and a retaliation claim

(Count IV). Ms. Williams has also brought a claim for retaliation under the HIPAA, the

EMTALA, and the AKA (Count III). For the following reasons, the Court grants the motion for

Counts I, II, and III but denies the motion for Count IV.

### A. Factual Background[1]

Ms. Williams is a Registered Nurse who was employed by Parkview from June 2015 until her termination on November 19, 2019. (DE 20-2 at 11:20–21, 82:5–6.). Starting in July 2016, and until her termination, Ms. Williams served as the Nursing Manger of the Emergency Room Department at the Warsaw Medical Complex. (*Id.* at 12:13–16.) As the Department's Nurse Manager, Ms. Williams supervised a staff of around forty employees. (*Id.* at 13:25–14:2.)

On July 23, 2019, Nurse Kristin Sedlmeyer, a member of Ms. Williams' staff at Warsaw, approached Ms. Williams. (*Id.* at 17:10–18:4.) Nurse Sedlmeyer reported that a physician in the Emergency Department, Dr. Winther, had inappropriately touched her during an ultrasound by resting his hand on her clothed genitals, and made inappropriate remarks to her.[2] (*Id.* at 17:10–18:4, 26:7–18.) Dr. Winther worked at Parkview and was subject to their employee conduct regulations but was formally employed by Professional Emergency Physicians which provides physician staff to the emergency room and retained disciplinary authority over their doctors. (DE 20-3 ¶¶ 8–9.) Nurse Sedlmeyer conveyed she did not want to file a complaint with human resources about the incident but requested Ms. Williams speak to Dr. Winther and get him to cease his behavior. (DE 20-2 at 27:4–10.) At the time this incident occurred, Parkview had in place an Anti-Harassment and Complaint Procedure ("Anti-Harassment Policy") which required supervisors to report possible harassment situations to human resources. (DE 20-6 at 8–9.) Ms.

---

[1] The Court notes neither party's brief on the motion for summary judgment includes a factual background section. (*See* DE 21, DE 27.) The inclusion of a factual background section in the brief is very useful to the Court in laying the factual groundwork for the motion, especially in factually dense cases such as this.

[2] Ms. Williams complaint anonymizes the names of these two individuals, as does Parkview's motion brief and reply. Ms. Williams' response brief, however, utilizes their proper names but does not explain the shift from anonymized names. For maximum clarity, the Court will also refer to these individuals by their proper names.

Williams knew of the Anti-Harassment Policy but prior to the incident with Nurse Sedlmeyer had never read it in detail. (DE 20-2 at 35:16–36:5, 145:2–9.)

Ms. Williams spoke privately with Dr. Winther about the allegations sometime later in July. (*Id.* at 27:16–19, 28:2–25.) Ms. Williams stated she confirmed the identity of the accuser during this meeting, Dr. Winther apologized to her and conveyed he wanted to apologize to Nurse Sedlmeyer as well. (*Id.* at 28:12–20, 29:14–23.) Following this meeting, Ms. Williams informed Nurse Sedlmeyer of the meeting, and met with Dr. Gutwein, the Medical Director of Parkview Warsaw. (*Id.* 29:25–30:9, 31:19–25.) Ms. Williams reported the details of the situation to Dr. Gutwein and during the meeting the two decided to report the incident to human resources. (*Id.* at 32:4–16.) On August 20, 2019, Ms. Williams met with Kim Harris of Parkview human resources to report the incident. (*Id.* at 34:3–11.)

Human resources launched an investigation into the allegation which interviewed fifteen Emergency Department staff, collected very little feedback about Dr. Winther, and found that the allegation against Dr. Winther could not be substantiated.[3] (DE 27-7 at 32–33.) The investigation lasted from August 21, 2019, until September 5, 2019, and concluded with a recommendation that the Warsaw Emergency Department staff undergo harassment in the workplace training conducted by human resources. (*Id.* at 33.)

Ms. Williams testified at her deposition that she had experienced inappropriate touching and comments from Dr. Winther on three occasions. The first incident was one week before Nurse Sedlmeyer's complaint, Dr. Winther allegedly grabbed Ms. Williams' buttocks as she

---

[3] From the investigation notes it is unclear if Nurse Sedlmeyer ever completed an interview or filed a written statement. The notes indicate that she was unable to complete an attempted interview, requested to file a written statement, but had not as of August 29, 2019, and the investigation concluded on September 5, 2019. (DE 27-7 at 32–33.)

3

walked through a door ahead of him. (DE 20-2 at 19:21–20:15.) The second incident was in

2016, within a few months of her taking the Nurse Manager role at Parkview. Dr. Winther made

inappropriate comments about Ms. Williams' attire when she stopped by the hospital for a social

visit after using the gym. (*Id.* at 20:20–21:12.) In particular, Dr. Winther allegedly asked Ms.

Williams if yoga pants were "going to be the new uniform." (*Id.* at 21:1–8.) The third incident

involved Dr. Winther's comment about a photo Ms. Winther kept in her office, in which she was

wearing a bathing suit. (*Id.* at 139:14–140:4.) Ms. Williams had been instructed to remove the

photograph by her supervisor on the basis it could be offensive to her staff. (*Id.*) Dr. Winther

allegedly asked about the photograph while conducting rounds with Ms. Williams, and upon

being told it was taken down, he allegedly stated "Well, give it to me. I'll hang it up in the

doctor's lounge." (*Id.* at 140:5–9.) The incident with the photograph occurred at some point

before Dr. Winther allegedly grabbed Ms. Williams' buttocks. (*Id.* at 140: 10–12.) Ms. Williams

testified that she did not report any of these incidents to her supervisors, or Parkview human

resources. (*Id.* at 21:13–14, 21:21–22, 175:1–10.)

On August 4, 2019, the Parkview Emergency Department had an incident ("the

EMTALA incident") where a pregnant patient went into preterm labor and the Emergency

Department staff could not provide adequate treatment which resulted in the prematurely born

infant passing away. (*Id.* at 44:24–47:24.) Ms. Williams was not working on the day of this

incident but learned of it afterward from coworkers. (*Id.* at 43:10–15.) The death of the infant led

to an investigation by the Centers for Medicare and Medicaid Services ("CMS") for potential

violation of EMTALA. (DE 20-7 ¶ 5.) The CMS investigation found an EMTALA violation

occurred because the Emergency Department failed to provide for an appropriate transfer to

another facility. (*Id.* ¶ 6.)

4

Ms. Williams testified that several times prior to the EMTALA incident she communicated to coworkers that the Emergency Department was not equipped to handle the delivery of an infant. (DE 20-2 at 50:22–51:19.) Ms. Williams never submitted any written complaints about her belief to her supervisors or Parkview leadership. (*Id.* at 53:19–20.) Ms. Williams indicates she does not believe she was terminated or placed on a Performance Improvement Plan ("PIP") for *reporting* an EMTALA violation, but believes Parkview placed her on a PIP because it received an EMTALA violation from CMS. (*Id.* at 120:19–121:8., DE 26 Response ¶ 62 (Plaintiff's response to ¶ 62 on p.19–20).)

Ms. Williams also believes Parkview staff inappropriately disclosed HIPAA protected information to a third party when the mother and infant were transferred to Kosciusko Community Hospital. (DE 20-2 at 75:10–24.) Believing this was a HIPAA violation, Ms. Williams reported it to Scott Gabriel, the President of Parkview Whitley Hospital and Parkview Warsaw. (*Id.* at 76:11–20.)

Following the EMTALA incident Parkview implemented a remedial action plan (DE 20-7 ¶ 7.) Ms. Williams was assigned several responsibilities as part of implementing this plan. (DE 20-3 ¶ 21(d).) Ms. Williams, however, was not disciplined or penalized in any way as a result of the EMTALA incident and Parkview does not attribute any fault to her for causing or contributing to the EMTALA incident. (*Id.*)

Also following the EMTALA incident, Parkview conducted a Root Cause Analysis ("RCA") which is a meeting of all responsible parties and leadership to review an incident, ensure all measures were properly taken, and determine whether there were any lessons to draw. (DE 20-2 at 48: 10–19.) The purpose of the RCA is to determine where improvements can be made in patient care and is not to assign blame or find fault. (*Id.* at 49:17–23.) Ms. Williams

5

sought to attend the RCA for the EMTALA incident but was informed by Jeff Rockett, the Vice President of Outpatient Services[4] at Parkview Warsaw, that he would not include her in the meeting. (*Id.* at 60:7–61:10.) Mr. Rockett communicated to Ms. Williams that she was not invited because Parkview leadership wanted to limit attendance to individuals who were part of the EMTALA event. (*Id.* at 65:3–14.) The final composition of the RCA was fourteen individuals, ten of whom were women, and included members of Ms. Williams' staff. (DE 20-7 ¶ 7, p. 4; DE 20-2 at 63:10 (Ms. Williams' testimony that her staff was not excluded), 64:2–8 (listing members of her staff who attended).) The individual tasked with leading the committee was also a woman. (DE 20-7 ¶ 14, p.4.)

Ms. Williams testified that she believed she was excluded from the RCA on the basis of her sex. (DE 20-2 at 63:6–15.) Ms. Williams believes that Mr. Rockett's explanation for not inviting her to the RCA was insincere because individuals from the Parkview Regional Medical Center, who were not involved in the event, were invited to participate.[5] (*Id.* at 65:16–24.) Parkview has also proffered the rationale that they excluded Ms. Williams from the RCA because of concerns she had coached, or would coach, her staff members on questions about any medical care the pre-viable infant did or did not receive during the EMTALA event. (DE 20-4 ¶ 10; DE 20-7 at ¶ 17.) Ms. Williams contends this explanation is implausible given that she and Parkview agree that neither her nor her staff contributed to the death of the infant, and therefore there would be no need for coaching responses.

---

[4] Ms. Williams' testimony referred to him as Vice President of Operations, but this appears to be a functional description and his formal title is Vice President of Outpatient Services. (*See, e.g.*, DE 20-4 at ¶ 9.) From the Court's review of the record there is no substantive distinction between these titles.

[5] Parkview Regional Medical Center is one of the hospitals where the Warsaw staff tried to transfer the patient when she entered pre-term labor. (DE 20-2 at 46:2–9.)

During the second week of August 2019, Ms. Williams met with the Interim Director of Nursing to discuss the EMTALA event. (DE 20-2 at 113:3–19.) During this meeting Mr. Rockett and Mr. Gabriel "abruptly" entered the office and sat down at the table where the meeting was occurring. (*Id.*) Neither of these men said anything during the meeting, but Ms. Williams indicates she nonetheless felt intimidated by their presence because they were her direct supervisors and she had thus far been excluded from discussions regarding the EMTALA event and the RCA. (*Id.* at 114:1–115:21.)

On October 29, 2019, Ms. Williams was placed on a Performance Improvement Plan ("PIP") by her supervisor Ashley Wirges. (DE 20-2 at 40:10–12; DE 20-3 ¶ 15.) Ms. Williams' PIP was scheduled to last thirty days. (DE 20-3 ¶ 19.) Ms. Williams has not identified a similarly situated male coworker who was placed on a PIP. (DE 20-2 at 88:22–89:8.) Parkview indicates there were several factors for placing Ms. Williams on a PIP. These included that she failed to timely escalate Nurse Sedlmeyer's hostile work environment complaint to human resources, (DE 20-3 at ¶21(a)–(e)), that human resources received negative feedback from Ms. Williams' subordinates concerning her performance during the course of the investigation into Nurse Sedlmeyer's complaint (DE 20-5 at ¶¶ 11–13, DE 20-5 at p.2), and the fact Ms. Wirges received further negative feedback from Ms. Williams' subordinates via email and during hospital rounds, including the fact that she did not foster an environment of trust (DE 20-3 ¶21(c)). Ms. Wirges' declaration indicates that she felt, based on her interactions with Ms. Williams, that Ms. Williams was not focused on her responsibilities related to the Remedial Action Plan. (DE 20-3 ¶21(d).) Specifically, Ms. Williams did not take ownership of her assigned tasks, and Wirges had to continually push Ms. Williams to ensure the tasks were completed in a timely manner. (*Id.*)

Ms. Williams argues that she was one of the highest performers in the Parkview system for her entire tenure as Nurse Manager. (DE 20-2 at 164:23–165:23.) Ms. Williams specifically notes her positive results on her Co-Worker Engagement Service (DE 27-20) and her history of positive annual evaluations from her employer (DE 27-13 at 1–58.). Notably, Ms. Williams' 2019 annual report, which was finalized on July 10, 2019, noted she had managed a number of relationship issues within her team with mentoring and setting accountabilities. (*Id.* at 55.)  The report also described her as "well respected by other leaders, physicians, and her staff." (*Id.* at 56.)

While the PIP was in place Ms. Wirges met with Ms. Williams several times to discuss her progress. (DE 20-3 ¶ 26.) Ms. Williams conveyed to Ms. Wirges that she had been struggling and lying awake at night for being placed on the PIP. (DE 27-9 at 6.)  Nonetheless, both Ms. Williams and Ms. Wirges felt these meetings were productive. ( DE 20-3 ¶ 27; DE 27-9 at 1–3.) Outside of these meetings Ms. Wirges learned that Ms. Williams was "verbalizing her discontent" with Parkview leadership. (DE 20-3 ¶¶ 28–29.) These actions include Ms. Williams allegedly contacting Angela Jacobs, the Medical Surgical Manager Nurse at Parkview Whitley, and encouraging her to file a hostile work environment complaint. (DE 20-2 at 91:22–93:16, 93:20–94:4.) Ms. Wirges was informed of Ms. Williams' communication with Ms. Jacobs by Erin Goldsberry, the Vice President of Parkview Noble, who reported the contact had occurred and Ms. Williams was "shit stirring." (DE 20-3 ¶ 29.) Ms. Goldsberry likewise communicated that Ms. Williams had expressed an opinion that she was dissatisfied with the leadership of Scott Gabriel and Jeff Rockett, and that Ms. Williams was allegedly contacting other disgruntled Parkview employees to "form a coalition against Parkview management." (*Id.*)

Ms. Wirges' notes, dated November 13, 2019, indicate she received a phone call from another executive level administrator (presumably Ms. Goldsberry) who reported receiving a phone call from a female manager at Whitley (presumably Ms. Jacobs). (DE 27-9 at 3.) The Whitley manager reported that she received a call from Ms. Williams with an overarching theme of "I see how you are being treated and it's not right" and that Ms. Williams indicated she planned to file something with corporate and the manager could join her in filing. (DE 27-9 at 3.) Ms. Wirges noted her thought that this frame of discussion was contrary to Parkview's standard of behavior "Together We're Better" and Ms. Wirges' belief this policy discouraged managers from framing issues in a "us" versus "them" attitude. (*Id.*) Ms. Wirges notes also indicate that Ms. Wirges communicated these beliefs and expectations to Ms. Williams during a meeting to discuss the PIP. (*Id.*)

Ms. Wirges concluded this behavior showed Ms. Williams was unwilling to accept her coaching and her aid in overcoming performance issues. (DE 20-3 at ¶ 31.) Ms. Wirges then made the decision to terminate Ms. Williams with the input of Mr. Rockett and Mr. Gabriel. (*Id.*) Parkview's position is that they terminated Ms. Williams due to her poor job performance and unwillingness to accept coaching to correct her performance issues. (*Id.* ¶¶ 31, 33.) Ms. Williams was offered the opportunity to resign and receive a severance package on November 20, 2019.[6] (*Id.* ¶ 32.) Ms. Williams did not accept this offer and her termination was finalized on December 17, 2019. (*Id.*) This meeting occurred within one week after Ms. Williams said she encouraged Ms. Jacobs to report her hostile work environment complaint. (DE 20-2 at 121:9–13.)

---

[6] Ms. Williams contends she was told she was being terminated at this meeting and was offered a severance package option immediately after being orally terminated. (DE 20-2 at 98:4–6, 100:12–23.) No matter what exactly was said during this meeting, the parties seem to agree that on November 29, 2019, everyone involved was aware Ms. Williams' employment with Parkview was ending and December 17, 2019, was the formalization of that understanding.

9

On August 12, 2020, Ms. Williams filed a charge with the Indiana Civil Rights Commission. (DE 20-2 at 107:9–108:8.) The charge was drafted for Ms. Williams by the Equal Employment Opportunity Commission ("EEOC") through the administrative complaint process. (*Id.* at 107:2–22.) The EEOC determined it would not proceed with its investigation and provided Ms. Williams with notice of her right to sue on August 31, 2021. (DE 20-6 ¶ 13, p.66–70.) On October 26, 2021, Ms. Williams filed her civil complaint in Indiana state court (DE 5) and the case was removed to this Court on November 24, 2021. (DE 1.)

### B. Parkview's Motion to Strike (DE 32)

Prior to resolving the motion for summary judgment, the Court will address the motion to strike.

Parkview has also moved to strike Plaintiff's Exhibit Y (DE 27-27) as inadmissible hearsay, and portions of Ms. Williams response to Parkview's Statement of Material Facts (DE 27) and her Additional Material Facts (*Id.*)[7] to be stricken for lacking citations to the record as required by the Local Rules. (DE 32.) As the second target of the motion, Parkview asks the Court to strike paragraphs 78, 79, and 129 of the response, and paragraph 129 of the Additional Material Facts. Parkview also requests that the Court strike portions of several paragraphs which are allegedly argumentative and unsupported by the record but embedded in factual content. Specifically, portions of response paragraphs 103, 108, 143, and Additional Material Facts paragraphs 103, 80, 81, and 108.

---

[7] Pursuant to Local Rule, Ms. Williams Statement of Additional Material Facts is a subsection of her response to Parkview's Statement of Material Facts.

Ms. Williams does not substantively respond to this motion, rather she argues that it is procedurally improper based on this District's Local Rule 56. She points to Local Rule 56-1(f) which became effective on February 25, 2022. This rule directs parties to address issues of admissibility or materiality of evidence in their summary judgment briefs and prohibits parties from filing separate motions to strike. N.D. Ind. L.R. 56-1(f). The previous version of the Rule required the parties to raise such disputes in separate motions to strike.[8] N.D. Ind. L.R. 56-1(e) (Nov. 18, 2019, Ed.). Parkview did not file a reply brief addressing this argument.

The Court will deny this motion as moot. Beginning with Exhibit Y, the Court did not need to consider this piece of evidence in resolving the motion for summary judgment. Exhibit Y is an excerpt of a text message conversation between Ms. Williams and a coworker, Angela Jacobs, regarding Ms. Jacobs intentions to report she was experiencing a hostile work environment to Parkview with Ms. Williams' encouragement. Further, it is unclear why the parties are disputing the admissibility of this evidence given, as previously discussed, Parkview has conceded this conversation took place and they were aware of it when they chose to terminate Ms. Williams. As the parties have agreed this conversation happened and Parkview was aware of it, there is no need for the Court to determine the admissibility of the evidence to consider that fact.

The Court now turns to the second target of the motion to strike, specific portions of Ms. Williams' response to Parkview's Statement of Material Facts and Ms. Williams' Additional Material Facts. These portions allegedly lack citations to the record in violation of Local Rules 56-1(b)(2)(C) and 56-1(b)(2)(D)(ii). The Court finds that all of the challenged text previously

---

[8] The Court will note that Parkview does refer to the Motion to Strike in their summary judgment reply brief but does not restate the substantive arguments. (DE 30 at 9 n.2.)

described constitutes legal argument or legal conclusion about the facts. Under no circumstances would the Court consider the parties' legal conclusions as statements of fact, which means none of the challenged content would factor into the Court's consideration of the motion for summary judgment.[9] The Court will disregard any apparent legal conclusions and independently apply the law to the facts, which makes the request to strike moot. *See Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985); *see also Paniaguas v. Aldon Cos. Inc.*, 2006 WL 2568210, *4 (N.D. Ind. Sept. 5, 2006) (when considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand).

Accordingly, Parkview's motion to strike (DE 32) is DENIED as moot.

### C. Legal Standard

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[9] Of course, the Court will still consider legal arguments the parties properly present in their briefs. The Court's action of striking or disregarding legal argument improperly placed in the Statement of Material Facts does not reflect the Court's view on the merits of that argument.

However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). There must be more than a mere scintilla of evidence in support of the opposing party's position and "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009); *Anderson*, 477 U.S. at 252. Instead, the opposing party must have "evidence on which the jury could reasonably find" in his or her favor. *Anderson*, 477 U.S. at 252.

### D. Discussion

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Ms. Williams has brought three claims against Parkview under Title VII: a hostile work environment claim (Count I), a sex discrimination claim (Count II), and a retaliation claim (Count IV). Ms. Williams has also brought a claim for retaliation under the HIPAA, the EMTALA, and the AKA (Count III). Parkview has moved for summary judgment on all four counts.

### (1) *Ms. Williams has conceded she has no legal claim under the EMTALA, the HIPAA or the AKA and that Parkview is entitled to summary judgment on Count III*

Parkview argues that they are entitled to summary judgment on Count III of Ms. Williams' complaint because she cannot bring a claim against them under either HIPAA or

EMTALA and she has not asserted a claim under the AKA.[10] Ms. Williams has not responded to these arguments in her response brief. Accordingly, she has waived these arguments and the Court will grant summary judgment to Parkview. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (Failure to respond to an argument results in waiver); *Rangel v. Schmidt*, 2011 WL 4496506, *12 (N.D. Ind. Sept. 27, 2011) ("when a party fails to respond to an issue raised in a summary judgment motion, the issue is deemed abandoned and waived").

The Court will briefly explain the reasoning and legal authority behind each of Parkview's arguments. Starting with the HIPAA, Parkview correctly argues that there is no cause of action for private citizens, such as Ms. Williams, to enforce the Act. Rather, the enforcement right of action is limited to the United States of America and the Attorneys General of the several states. *Lundell v. Reg'l*, 2013 WL 633319, at *2 (N.D. Ind. Feb. 20, 2013). Turning to the EMTALA, Parkview argues that Ms. Williams cannot bring a claim for retaliation under the whistleblower protection provisions of that statute because she did not report a violation. Parkview has cited to legal authority which supports this proposition. *See Genova v. Banner Health*, 734 F.3d 1095, 1099 (10th Cir. 2013) (EMTALA's whistleblower protection provision "permits suit only when the plaintiff was harmed by or reported an *existing* EMTALA violation, not an *impending* one."). Ms. Williams does not dispute that she seeks protection under the statute for reporting an *impending* violation. Finally, the AKA. Parkview argues they are entitled to summary judgment on this claim because Ms. Williams has failed to develop it. Specifically, Ms. Williams' complaint makes two passing references to an "Anti-Kickback Act" but never

_____

[10] Parkview also argues that the HIPAA and EMTALA claims are procedurally barred because they were not raised in her EEOC complaint. Generally, the Court would resolve a procedural question before the substantive question, but in light of Ms. Williams concession on the merits of the legal argument the procedural question is moot. Thus, the Court assumes, without deciding, Ms. Williams could permissibly raise the HIPAA and EMTALA claims in her complaint and will dismiss them on the merits.

refers to a specific statutory provision, nor explains what conduct violates this act or why she has a right to bring suit under it. (DE 5 at 2, 10.) The Court agrees that Ms. Williams has failed to state a claim by not describing the cause of action or including how the facts satisfy the elements.[11] *See Shipley*, 947 F.3d at 1062–63.

As a result, the Court grants Parkview summary judgment on Count III of Ms. Williams complaint.

### (2) *Ms. Williams hostile work environment claim was timely filed, but she has failed to state a prima facie case (Count I)*

Parkview argues they are entitled to summary judgment on Ms. Williams' hostile work environment claim because two procedural defects bar her from bringing the claim, and, on the merits, she has failed to state a claim which survives summary judgment. The Court will address the procedural arguments and, if necessary, advance to the merits. The two procedural arguments are: (1) Ms. Williams failed to raise a hostile work environment claim in her charge of discrimination to the EEOC and (2) Ms. Williams' hostile work environment claim is time barred because she filed her EEOC charge regarding this claim outside the statute of limitations.

### (a) *Ms. Williams raised her hostile work environment claim in her EEOC charge*

---

[11] It is possible Ms. Williams was referring to the federal *criminal* statute codified at 42 U.S.C. § 1320a–7b(b). That statute is commonly known as the Anti-Kickback Act and regulates payments in federal healthcare programs. If Ms. Williams was speaking of this statute, her claim would fail as that law does not have a private right of action. *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 738–39 (noting that statute is known as the Anti-Kickback Act and Seventh Circuit precedent holds there is no private right of action).

Parkview first argues that Ms. Williams' hostile work environment claim should be dismissed, because her charge with the EEOC failed to raise a hostile work environment claim that included the specific "term hostile work environment."

As a precondition to filing claims under Title VII, a plaintiff is required to file a charge with the EEOC. *Huri v. Off. of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 831 (7th Cir. 2015) (citing *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013)). That said, Courts review the scope of an EEOC charge liberally. *Id.* (internal citation omitted). The charge is not required to include every fact that, "individually or in combination, forms the basis of a subsequent lawsuit's claims." *Id.* (citing *Cheek v. Western and Southern Life Ins. Co*., 31 F.3d 497, 500 (7th Cir. 1994)). Rather, to be cognizable in federal court the Title VII claim merely has to be "like or reasonably related to the allegations of the charge and growing out of such allegations." *Id.* (quoting *Cheek*, 31 F.3d at 500).

Ms. Williams' claim clears this modest hurdle. Ms. Williams EEOC charge does not utilize the phrase "hostile work environment," but it alleges most of the same incidents of harassment contained in her Title VII claim perpetrated by the same actors. Specifically, her placement on a PIP and exclusion from the RCA. (*Compare* DE 5 at 7–8 (civil complaint) *with* DE 20-6 at 66–70 (EEOC charge)).

Further, *Huri* expressly rejected the idea that a plaintiff's failure to use the phrase "hostile work environment" in her EEOC charge is dispositive. 804 F.3d at 832. Ms. Huri, like Ms. Williams, did not use the phrase hostile work environment in her EEOC charge. *Id.* But she alleged she had endured harassment based on her religion and national origin over the course of her employment. *Id.* The Seventh Circuit noted that the term harassment was frequently used to describe the conduct which makes up a hostile work environment and that it would not penalize

16

Ms. Huri for "describing her plight with the same interchangeable phraseology frequently used by this Court." *Id.* As such, the Court will not punish Ms. Williams for failing to use the phrase "hostile work environment" in her EEOC charge.

Accordingly, the Court will deny Parkview's request for summary judgment on exhaustion.

>   (b) *Ms. Williams' hostile work environment claim is not barred by the statute of limitations*

Parkview's second procedural argument is that Ms. Williams hostile work environment claim is time barred because she filed her charge with the EEOC more than 300 days after the last underlying event.

In deferral states[12] such as Indiana, a plaintiff who asserts Title VII claims has 300 days from the alleged discriminatory or retaliatory act to file a time charge of discrimination with the EEOC. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 744 (7th Cir. 2021). A defendant may invoke a plaintiff's failure to timely file a charge with the EEOC as an affirmative defense. *Id.* When the statute of limitations begins to toll is not necessarily a straightforward question, as the Supreme Court has held that the continuing violation doctrine can reset the clock based on repeated employer violations.

In *National Railroad Passenger Corp. v. Morgan,* the Supreme Court explained when a plaintiff may rely on the continuing violation doctrine to recover for discriminatory acts that fall

---

[12] The normal statute of limitations for filing with the EEOC is 180 days, but it is expanded to 300 days if the complainant files their charge with the appropriate state or local agency. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII statute of limitations). The parties do not dispute Ms. Williams is entitled to the 300-day window.

outside the 300–day limitations period. 536 U.S. 101 (2002). The doctrine operates differently according to the type of discriminatory act alleged—"discrete" discriminatory acts or acts contributing to a hostile work environment. *Morgan*, 536 U.S. at 114–15. The Supreme Court gave examples of discrete acts including "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114.

The Court explained that each discrete act starts a "new clock" for filing charges and the clock starts on the date the act occurred. *Id.* at 113. Further, "any discrete discriminatory acts that fall outside the statute of limitations are time-barred even though they may relate to other discrete acts that fall within the statute of limitations." *Lucas v. Chi. Transit Auth*., 367 F.3d 714, 723 (7th Cir. 2004) (citing *Morgan*, 536 U.S. at 112–13.) Likewise, a timely filed discrete act "cannot save discrete acts that are related but not timely filed." *Id.* (citing Morgan, 536 U.S. at 112.)

The Court then distinguished discrete acts from a second category of acts, those contributing to a hostile work environment. *Lucas*, 367 F.3d at 724. These claims involve "repeated conduct" which "may not be actionable on its own." *Id.* (quoting *Morgan*, 536 U.S. at 115). Instead, "such claims are based on the cumulative effect of individual acts." *Id.* Consequently, the incidents constituting a hostile work environment are part of a single unlawful employment practice and "provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be determined by a court for the purposes of determining liability." *Id.* (quoting *Morgan*, 536 U.S. at 117.)

The parties do not dispute that Ms. Williams filed her EEOC charge on August 12, 2020. Nor do the parties dispute that 300 days prior would be October 17, 2019, or that the continuing

violation doctrine applies given Ms. Williams is alleging a hostile work environment. Instead, the parties dispute when the last act contributing to the hostile work environment occurred.

Parkview suggests that September 1, 2019, is the most accurate estimate given, by Parkview's account, all five acts of harassment Ms. Williams alleged occurred during or before August 2019. Parkview argues those five acts are (1) Ms. Williams being sexually harassed by Dr. Winther sometime before July 2019, (2) Ms. Williams being told by management she mishandled Nurse Sedlmeyer's harassment complaint in August 2019, (3) Ms. Williams being excluded from the RCA on August 6, 2019, (4) Ms. Williams having an "intimidating meeting" with two superiors in August 2019, and (5) Ms. Williams' alleged warnings to Parkview about its inability to deliver a pre-viable fetus before the EMTALA event of August 4, 2019. (DE 21 at 4; DE 30 at 2–3.)

Ms. Williams replies that this list is incorrect and misses events which would render her claim timely. Namely, her placement on a PIP on October 29, 2019, and her termination by Parkview on November 19, 2019. (DE 27 at 12, 26; *see also* DE 5 at 7 (incorporating by reference her placement on a PIP and termination as hostile work environment acts), 5–6 (describing that her placement on the PIP as a part of her hostile work environment claim).)

Parkview's reply brief does not address Ms. Williams' argument. Instead, Parkview restates its belief that the hostile work environment claim only consists of the five acts enumerated in their principal brief, indifferent or unaware of the contrary characterization in Ms. Williams' complaint and her response. This is unhelpful briefing, but the Court's own research of the question has found sufficient guidance to decide the argument

In *Boss v. Castro*, the Seventh Circuit held that implementing a PIP is not a materially adverse employment action in the discrimination context. 816 F.3d 910, 918 (7th Cir. 2016)

(collecting cases). The court then stated that a "legitimate, non-pretextual" PIP could not support a hostile work environment claim. *Id.* at 920. But this passage of *Boss* implies that placing an employee on a PIP *may* be an act of harassment contributing to a hostile work environment when the PIP is illegitimate or is pretextual. *Id.* at 920.[13] In addition, a fellow Judge within this district has found that while a negative performance review or placement on a PIP alone is not sufficient to constitute an adverse employment action, these events can be part of an actionable hostile work environment claim. *Jain v. Int'l Trucking and Engine Corp.*, 2007 WL 2904088, at \*10 (N.D. Ind. 2007).

In light of this authority, the Court finds the last act of alleged harassment underlying the hostile work environment claim was Parkview placing Ms. Williams on a PIP on October 29, 2019, which is within 300 days of when Ms. Williams filed her EEOC charge. Accordingly, Ms. Williams timely filed her EEOC charge, and Parkview is not entitled to summary judgment on the basis of the statute of limitations.

Having rejected Parkview's procedural arguments, the Court will now advance to the merits of Ms. Williams' hostile work environment claim.


(c) *Ms. Williams has failed to state a prima facie case for her hostile work environment claim*

Turning to the merits of Ms. Williams' hostile work environment claim, the Court finds Parkview is entitled to summary judgment.

---

[13] The parties did not sufficiently brief the issue of whether failure on the merits of the only act within the statute of limitations that is a continuing violation case renders the entire claim time-barred or how the equitable tolling argument Ms. Williams raised would apply to that situation. Therefore, in an abundance of caution, the Court will analyze the hostile work environment claim on the merits, though it notes the ultimate ruling is the same under either approach.

To have her hostile work environment claim survive summary judgment, Ms. Williams must present evidence of four elements: (1) unwelcome harassment, (2) based on a protected characteristic, (3) that was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) a basis for employer liability. *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 977 (7th Cir. 2021) (*en banc*) (citing *Howard v. Cook Cty. Sheriff's Off.*, 989 F.3d 587, 600 (7th Cir. 2021)). A successful hostile work environment claim based on sexual harassment need not involve sexual conduct, but can be successful by showing the work environment was sexist. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018).

Parkview argues that Ms. Williams has not established the third and fourth elements of this claim related to her alleged harassment by Dr. Winther. Parkview also argues that the remaining incidents Ms. Williams complains of do not satisfy the first, second, or third elements. The Court will use the same grouping to discuss Ms. Williams' claim and begin with the incidents involving Dr. Winther.

(i) Ms. Williams has not established employer liability for her alleged harassment by Dr. Winther

The Court agrees with Parkview that Ms. Williams has not established employer liability regarding her alleged harassment by Dr. Winther. As a reminder, Ms. Williams alleges Dr. Winther sexually harassed her three times: commenting on workout clothes sometime in 2016, commenting on her bathing suit photo at some unspecified time, and grabbing her buttocks in July 2019.

The inquiry for employer liability under Title VII begins with determining whether the harassment was caused by a coworker or a supervisor. An employer can be liable for hostile work environment claims either through strict liability, which is incurred when a supervisory employee is involved in the unlawful employment practice, or through negligence which is incurred when the employer is "negligent in either discovering or remedying the harassment [perpetrated by others, such as coworkers or customers]." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 904 (7th Cir. 2018). In determining whether an employer was negligent, the Court asks whether they took "prompt and appropriate corrective action reasonable likely to prevent the harassment from recurring." *Id.* at 906 (quoting *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 898 (7th Cir. 2016).

Further, an employer cannot be expected to correct sexual harassment unless the employee makes a concerted effort to inform the employer that a problem exists. *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997). Therefore, notice or knowledge of the harassment is a prerequisite for liability. *Id.* To survive summary judgment, the plaintiff must present evidence to show that she gave the employer enough information to make a reasonable employer think there was some possibility that she was being sexually harassed. *Zimmerman v. Cook Cty. Sheriff's Dept.*, 96 F.3d 1017, 1019 (7th Cir. 1996). It is also possible to establish notice through the complaints of other employees or inferring knowledge based on the "sheer pervasiveness" of the harassment. *Id.* As the Court will discuss however, based on the currently constituted record, the only manner in which Parkview could have learned of Ms. Williams alleged harassment was through her reporting it.

As for Ms. Williams' alleged harassment by Dr. Winther, the parties do not dispute he was Ms. Williams' coworker[14] and Ms. Williams admits that she never informed her supervisors or human resources of any of these harassing acts. With no other argument, this lack of notice to Parkview of Dr. Winther's behavior would preclude Ms. Williams from building a hostile work environment claim off those actions.

Recognizing this issue, Ms. Williams argue that employer liability exists because Parkview was negligent *in their investigation of Nurse Sedlmeyer's complaint* and but for that negligence they would have discovered that Ms. Williams was also harassed. To begin, Ms. Williams does not proffer any case law to support the proposition that an employer becomes categorically liable to Employee A for failing to discover Employee A was harassed while investigating the harassment complaint filed by Employee B, no matter what that investigation finds. This Court has previously noted it is skeptical of unexplained assertions that investigations into incidents involving one coworker should have discovered conduct related to a plaintiff. *See Owens v. Forest River Mfg., LLC*, 2022 WL 4535425, at *7 n.7 (N.D. Ind. Sept. 28, 2022).

Ms. Williams advances three arguments on why Parkview's investigation was negligent: (1) they did not interview Ms. Williams about her experience with Dr. Winther, (2) Dr. Winther was not terminated or disciplined as a result of the investigation despite evidence corroborating Nurse Sedlmeyer's claim, and (3) Dr. Winther was later investigated a second time and Parkview took disciplinary action. None of these arguments persuade the Court that Parkview's

---

[14] Ms. Williams response objects to Parkview's use of the term "co-employee" to describe Dr. Winther in their briefing, but ultimately notes the term is interchangeable with coworker as used in the case law. (DE 27 at 20.) The Court agrees the two terms are interchangeable and notes Ms. Williams does not allege that Dr. Winther was a supervisor.

investigation was negligent or that they otherwise failed to take prompt and appropriate corrective action. *Johnson*, 892 F.3d at 906.

As to the first argument, Ms. Williams never explains why she should have been interviewed as part of a reasonable investigation into Dr. Winther's harassment of Nurse Sedlmeyer. From the facts laid before the Court, Ms. Williams, in her role as Nurse Sedlmeyer's supervisor, elevated a complaint of sexual harassment to Parkview human resources. Human resources then investigated, including interviewing fifteen Emergency Department staff about the allegations. At no point does it appear any witness provided information to the investigators suggesting Ms. Williams had faced sexual harassment or that Ms. Williams had personal knowledge of the events underlying the complaint. Nor does the record suggest Ms. Williams provided such information to human resources. Without any more explanation from Ms. Williams, it is hard to discern a motive for human resources to interview a supervisor who has no personal knowledge of the allegation being investigated and whose only involvement seems limited to the ministerial duty of advancing a subordinates' complaint.

On the second argument, Ms. Williams' disagreement with the result of the investigation does not make it negligent. More importantly, the Court is unsure what bearing this investigation has on *Ms. Williams' claims* given she does not meaningfully argue, and no evidence suggests that any of her alleged harassment was or should have been discovered during this particular investigation. To recap, after completing its investigation, human resources concluded that the accusation against Dr. Winther could be not substantiated yet recommended that the entire staff receive sexual harassment training. Ms. Williams argues this result is negligent as five nurses provided some substantiation for Nurse Sedlmeyer's complaint, and the failure to terminate Dr. Winther shows negligence in remedying his behavior. The Court would take a moment to

24

elaborate on these five accounts. While the five nurses indicate having heard of the alleged incident between Nurse Sedlmeyer and Dr. Winther, with some being informed by Nurse Sedlmeyer of her experience and others hearing of it secondhand, none witnessed it or otherwise reported observing misconduct by Dr. Winther towards Nurse Sedlmeyer, themselves, or Ms. Williams. (DE 27-7 at 1, 5, 12, 15, 27.) Also, as previously noted, it is unclear from the record whether Nurse Sedlmeyer fully participated in the investigation.

Nothing about these five accounts indicates Parkview was negligent for not interviewing Ms. Williams or failing to discover her experience with Dr. Winther. None of the interviewees mentioned any problems between Ms. Williams or Dr. Winther, nor did they raise additional allegations of misconduct besides Nurse Sedlmeyer's. Phrased another way, there is no evidence that any leads emerged in the investigation of Nurse Sedlmeyer's complaint which would have pointed investigators to the incidents involving Ms. Williams. It is not negligence to fail to pursue non-existent leads. If, counterfactually, one of the nurses had reported Dr. Winther previously harassed Ms. Williams or was a chronic harasser of other females in the Emergency Department and Parkview opted against following up, then that would be the beginning of a claim of negligence for Ms. Williams. But those are not the facts of this case.

Again, Ms. Williams does not explain why she should have been interviewed as a part of this investigation. There remains no explanation of why Parkview would have been aware of Ms. Williams' issues with Dr. Winther, and no evidence in the record fills in the gap either. Thus, the Court cannot conclude Parkview negligently failed to discover Dr. Winther's alleged harassment of Ms. Williams in its investigation of Nurse Sedlmeyer's complaint.

Ms. Williams' third argument is also without merit. In June 2020, well after the Sedlmeyer investigation had concluded on September 5, 2019, (DE 27-7 at 33), and well after

25

the three incidents involving Ms. Williams, another complaint was brought against Dr. Winther by two nurses. (DE 27-3 at 1–2.) These nurses alleged a series of sexually harassing acts by Dr. Winther in October and November 2019, and April 2020. Based on the multiple substantiated allegations of inappropriate behavior in this new complaint, while also noting Dr. Winther had been investigated for sexual harassment less than a year prior, human resources recommended that he lose his employment privileges at Parkview. (*Id.* at 2.) The fact Parkview reached a different conclusion in the second investigation after learning of events which occurred after the initial investigation concluded is not evidence that the first investigation was negligent. Undoubtedly, the negligence standard does not demand employers retain precognitive human resources investigators to detect future employee harassment. The Court is thus unpersuaded that Parkview terminating Dr. Winther's privileges for his conduct after the second investigation proves that initial investigation was negligent.

Accordingly, the Court finds that Ms. Williams has not established employer liability for her alleged sexual harassment by Dr. Winther because she has not established Parkview had sufficient knowledge of his conduct.


(ii) Dr. Winther's conduct does not rise to the level of severe and pervasive harassment

In the alternative, Parkview would be entitled to summary judgment as Ms. Williams has not shown Dr. Winther's conduct meets the legal threshold of severe or pervasive harassment.

The third element of a hostile work environment claim requires the unwelcome conduct to be severe or pervasive from both a subjective and an objective point of view. *Howard v. Cook Cty. Sheriff's Off.*, 989 F.3d 587, 600 (7th Cir. 2021). To be considered severe or pervasive

enough to create a hostile work environment, the conduct at issue must be "extreme." *Id.* (internal quotations omitted). This test is not, and by its nature cannot be, "mathematically precise." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). Determining whether conduct rises to this level is a fact intensive inquiry which requires evaluating the totality of the circumstances. *Demkovich*, 3 F.4th at 977. This includes "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Howard*, 989 F.3d at 600 (quoting *Harris*, 510 U.S. at 22). Further, "isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) (internal citation omitted).

Dr. Winther's conduct does not satisfy this standard. Dr. Winther's conduct was somewhat infrequent, with three events over the course of three years which weighs against finding it to be severe or pervasive. *Patt v. Fam. Health Sys., Inc.,* 280 F.3d 749, 752 (7th Cir. 2002) (eight sexual comments made by a handful of individuals over several years were too isolated and sporadic to constitute severe or pervasive harassment; *Filipovic v. K&R Exp. Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (four national-origin comments made over the course of more than a year were too infrequent to sustain a hostile work environment claim).

The severity of Dr. Winther's conduct is more favorable to Ms. Williams' argument but is still not enough to create a claim. Dr. Winther's two verbal statements were not physically threatening or humiliating to Ms. Williams, and as offensive utterances, do not weigh strongly in favor of finding a severe or pervasive environment. *Harris*, 510 U.S. at 23 (courts should consider whether a statement is "physically threatening or humiliating, or a mere offensive utterance").

Dr. Winther's act of grabbing Ms. Williams' buttocks, as an act of physical touching, is more severe than mere verbal conduct. Still, offensive physical touching does not automatically create a hostile work environment claim and "[p]hysical harassment lies along a continuum just as verbal harassment does." *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir. 2000). At one end are forms of physical contact, such as a hand on the shoulder or a peck on the cheek, which although unwelcome and uncomfortable for the person touched are relatively minor. *Id.* Even cruder acts such as a kiss on the lips or pinch on the buttocks may not constitute severe harassment when they occur in isolation. *Id.* (collecting cases); *see also Swyear*, 911 F.3d at 882 (reaffirming this holding in *Hostetler*); *Cooper v. Eaton Corp.*, 498 F. Supp. 3d 1053, 1065–66 (N.D. Ind. 2020) (citing the *Hostetler* holding in granting summary judgment on a claim where a male coworker poked a female coworker several times around her waistline, bra line, and possibly touched her breast). At the other end of the spectrum lies "forced physical contact and touching of sexual body parts, which may be sufficient, even in isolation, to support a claim of hostile work environment." *Bilal v. Rotec Indus.*, 326 Fed. App'x 949, 958 (7th Cir. 2009) (unpublished) (citing *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001)).

Dr. Winther's single act of grabbing Ms. Williams' buttocks is reprehensible but fits in the middle of the spectrum and due to its relative isolation, would not be regarded as severe under the governing case law. *Bilal*, 326 Fed. App'x at 958 (defendant's alleged act of "taking a chocolate out of his mouth and placing it in Bilal's, while bizarre and disgusting …. because it occurred in relative isolation, cannot be regarded as severe under the existing case law."); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361–62 (7th Cir.1998) ("four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" was insufficient); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 706–08 (7th Cir.1995) (one incident in which supervisor

28

rubbed foot against plaintiff's leg and another where he grabbed plaintiff's buttocks was insufficient); *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993) (finding that two attempts by a supervisor to kiss the plaintiff were insufficient).

After examining Dr. Winther's conduct holistically, the Court finds it is clearly inappropriate but does not meet the threshold of severe or pervasive necessary to sustain a hostile work environment claim.

(iii) Ms. Williams has not shown any of the remaining incidents of alleged harassment occurred on the basis of her sex, or that they rise to the level of severe or pervasive harassment

Besides the alleged harassment by Dr. Winther, Ms. Williams alleges that her placement on a PIP[15], Mr. Rockett and Mr. Gabriel being present during a meeting, and her exclusion from the RCA constitute harassing acts which created a hostile work environment.

The Court will begin with Ms. Williams exclusion from the RCA. The Court agrees with Parkview on an initial matter that it is odd to frame this as a hostile work environment claim instead of sex discrimination. This exclusion is not harassment or abuse as normally discussed in Title VII cases, and exclusion from a work opportunity seems to fit within the framework of a sex discrimination claim more naturally.[16] But in either case Ms. Williams has failed to state a *prima facie* claim based on this event.

---

[15] Parkview frames Ms. Williams being told she mishandled Nurse Sedlmeyer's complaint as an alleged act of harassment (*See supra* § D(2)(b).) The Court views it as a component of Ms. Williams being placed on the PIP as it was one of the justifications.

[16] Ms. Williams also uses it as part of her sex discrimination claim in Count II.

Both hostile work environment and sex discrimination claims require that the adverse events be based on the plaintiff's sex, "a protected characteristic." *Demkovich*, 3 F.4th at 977 (hostile work environment); *Nigro v. Indiana Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022) ("To establish that an employer discriminated against her in contravention of Title VII, a plaintiff must show that her membership in a protected class caused her discharge or other adverse employment action."). Ms. Williams suffers from a failure of proof on this point. Ms. Williams does not have direct evidence she was excluded based on her sex, rather she asks the Court to make an inference based on indirect evidence. This is permissible in Title VII cases but is unavailing to Ms. Williams.

Parkview notes, and Ms. Williams does not dispute, that ten out of the fourteen RCA attendees were women including the presiding member. This fact strongly undermines Ms. Williams contention that her sex was the basis for her exclusion from the RCA. It is hard to conclude anti-female animus was responsible for the composition of a group, when that group ends up being 70% female and led by a woman. Ms. Williams tries to get around this issue by emphasizing her status as a manager and arguing that none of the ten female attendees were "similarly situated colleagues of the Plaintiff or members of nurse leadership." (DE 27 at 27.) In effect, Ms. Williams seeks to redefine her claim to be sex discrimination against female managers. This amendment is unavailing to Ms. Williams.

The only evidence supporting this variation of her argument is Ms. Williams' deposition testimony indicating that she did not know of any female nurse leadership who were present at the RCA. (DE 20-2 at 154:14–15.) If female nurse leadership was excluded from a meeting but male nurse leadership was included, that might be the start of a claim. But that is not the evidence present here. Ms. Williams next statement in her deposition, after noting no female

nurse leadership was present at the RCA, seemingly indicates that no nursing leadership was present at all. (*Id.* at 154:19–155:4.) This is further corroborated by an exhibit to the declaration of Kathleen Martinez, a Parkview Risk Analyst, which lists the attendees at the RCA. (DE 20-7 at 4.) None of the individuals listed are men in roles Ms. Williams would describe as nurse leadership.[17] (*Id.*) As a result, the Court finds no evidence in the record to support Ms. Williams contention that female nurse leadership was excluded from the RCA, but male nurse leadership was included. As such, her recharacterized claim based on the composition of the RCA cannot withstand summary judgment. *See Roger Whitmore's Auto. Services, Inc. v. Lake Cty.*, 424 F.3d 659, 669 (7th Cir. 2005) (to defeat summary judgment the plaintiff must present something beyond "bare speculation or a scintilla of evidence").

Additionally, and in the alternative, Ms. Williams has offered no evidence that her exclusion from the RCA altered the conditions of her employment. Earlier, the Court noted how the purpose of the RCA is to determine where improvements can be made in patient care and is not to assign blame or find fault. Ms. Williams offers no explanation on how her exclusion from the RCA altered her conditions of employment. So the Court finds her exclusion from the RCA does not constitute an act of harassment that can support a hostile work environment claim.

In a related vein, and looking ahead to Ms. Williams' sex discrimination claim, the Court will note that the RCA exclusion also does not constitute an adverse employment action. Adverse employment actions are generally economic injuries such as dismissal, suspension, or failure to promote. *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). Even so, an adverse action is not limited solely to economic injuries. *Collins v. Illinois*,

---

[17] Ms. Williams considers Nurse Leadership roles to be "Nurse manager, nurse supervisor, or executive nurse director." (DE 20-2 at 154:16–18.) It is unclear if the RCA member identified as an "RN (Lead)" would qualify under this definition. (DE 20-7 at 4.)

830 F.2d 692, 703 (7th Cir. 1987) (holding that a lateral transfer was really a demotion because the transfer included the loss of a host of accoutrements such as business cards, desk, phone, and listing in professional directories). Still, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). For example, the denial of reimbursement for travel expenses and denial of bonuses are generally not adverse employment actions. *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (travel expenses); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2001) (denial of bonus).

Ms. Williams' exclusion from the RCA did not affect her compensation, work conditions, or job responsibilities in any way the Court can discern. While Ms. Williams did have to implement a Remedial Action Plan with her staff as a result of the EMTALA event, she has not argued the terms of the plan would be any different if she had attended the RCA or that her obligation to follow directives on patient care and Emergency Department operations is different from her preexisting duties.

For the same reasons, the Court cannot conclude the exclusion from the RCA satisfies the objective element of severe or pervasive harassment. *See Howard*, 989 F.3d at 600 (severe or pervasive harassment is measured by both subjective and objective standards). The subjective prong turns on whether the evidence shows the plaintiff individually found the conduct to be severe or pervasive, while the objective prong examines whether a reasonable person would find the conduct to be severe or pervasive. *EEOC v. Costco Wholesale Corp.*, 906 F.3d 618, 625 (7th Cir. 2018) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). While Ms. Williams has indicated that she found these events to be subjectively offensive, she has not

thoroughly developed why exclusion from this work activity is objectively offensive or cited any legal authority to that effect.

The Court finds that Ms. Williams has not shown that her exclusion from the RCA was on the basis of her sex, nor that her exclusion altered her conditions of employment or constituted an adverse employment action, nor that it was objectively severe or pervasive. Consequently, her exclusion from the RCA cannot sustain either a hostile work environment or a sex discrimination claim.

Turning to her placement on a PIP, there is a similar failure of evidence that it was motivated by Ms. Williams' sex. As previously noted, Ms. Williams admits she cannot identify a similarly situated male coworker who was not placed on a PIP to serve as a comparator. (DE 20-2 at 88:22–89:8.) The only evidence Ms. Williams offers to show that she was placed on a PIP due to her sex is her own speculative testimony about Parkview's motive. Parkview has offered evidence for the non-prohibited rationale that she was placed on a PIP due to her poor performance in implementing the Remedial Action Plan and because of negative feedback from subordinates.[18] In the absence of any contrary evidence, the Court finds Ms. Williams' claim cannot survive summary judgment.

In the alternative, the Court would note that Ms. Williams placement on a PIP alone or alongside the other facts here would not constitute severe or pervasive harassment. Again, this standard requires the conduct to satisfy both an objective and a subjective component. *Howard*, 989 F.3d at 600. The record shows Ms. Williams experienced subjective distress from being placed on a PIP, "struggling" and lying awake at night after her placement. (DE 27-9 at 6.)

---

[18] The Court would note that Ms. Williams also seems to argue her placement on a PIP was Parkview's decision to scapegoat her for the fact they received an EMTALA violation. Nothing about that claim supports the inference that Ms. Williams was placed on a PIP on the basis of her sex.

However, Ms. Williams does not explain how the PIP constitutes *objectively* severe or pervasive harassment. Nor has she discussed how the terms or requirements of the plan and how those affected her job performance. From the face of the document, it only imposes modest requirements that Ms. Williams: (1) sign the standards of behavior document, (2) complete leadership training on sexual harassment, (3) continue to work to build trust with her team, and (4) review HR report about licensures and certifications coming due then connect with coworkers before renewal times and remove coworkers from the schedule if not timely renewed. (DE 20-3 at 11.) Perhaps these terms were burdensome in the manner they were applied to Ms. Williams or there are other conditions imposed which are not reflected here. But without evidence of such conduct Ms. Williams' claim falls considerably short of establishing the PIP was objectively severe or pervasive harassment. Consequently, the Court cannot conclude it was objectively offensive.

Further, the Seventh Circuit has expressed skepticism about the severity of PIPs. *Abebe v. Health and Hosp. Corp. of Marion Cty.*, 35 F.4th 601, 607 (7th Cir. 2022) ("Performance improvement plans, particularly minimally onerous ones ... are not, without more, adverse employment actions." (internal quotation omitted)); *see also Cole v. Illinois*, 5662 F.3d 812, 816 (7th Cir. 2009) (finding that a PIP was not an adverse employment action even though the employee was required to submit daily and weekly schedules to her supervisors). The Court recognizes these cases are discussing PIPs in the context of a Title VII retaliation claim, which is distinct from a hostile work environment claim. Still, these causes of action are related enough to help guide the Court's present analysis and Ms. Williams has presented no caselaw which would dispute the Court's reasoning.

For her claim about Mr. Rockett and Mr. Gabriel entering her meeting with the Interim Director of Nursing, the Court finds no basis for concluding this was on the basis of her sex or constitutes severe or pervasive harassment. Ms. Williams offers no reasoning to show how their attendance was motivated by her sex. Further, Ms. Williams subjective discomfort at their presence is not sufficient to make this severe or pervasive harassment. Neither of these men said anything while they sat in on the meeting, let alone anything harassing or threatening to her. Ms. Williams has also not offered any explanation of how their mere physical presence was intimidating, such as that they engaged in physically acts which could be viewed as intimidating. *See Owens*, 2022 WL 4535425, at *6, *6 n.5 (finding that a female plaintiff's allegation she felt "intimidated" by the mere fact she was alone in a meeting with two male supervisors was not sufficient to constitute an act of harassment).

Considering the totality of the circumstances alleged by Ms. Williams, the Court finds she has not shown she was subject to harassment on the basis of her sex which was severe or pervasive. Even assuming all these alleged events were on the basis of Ms. Williams' sex, the infrequency of these events and respective levels of severity do not collectively establish severe or pervasive harassment in Ms. Williams workplace during the relevant time period.

For these reasons, the Court finds that Ms. Williams has not established a *prima facie* hostile work environment claim and Parkview is entitled to summary judgment on Count I.

**(3) *Ms. Williams has not made a prima facie case for sex discrimination and Parkview is entitled to summary judgment on Count III.***

Parkview argues they are entitled to summary judgment on Ms. Williams' sex discrimination claim as she has not shown that any of the actions Parkview took against her were on the basis of her sex. The Court agrees and will grant summary judgment on this count.

To establish that an employer discriminated against her in violation of Title VII, a plaintiff must show that her membership in a protected class caused her discharge or other adverse employment action. *Nigro v. Indiana Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022).

A plaintiff can go about showing that in two ways. The first method is the *McDonnell-Douglas* burden shifting framework. At the first step, this framework requires a plaintiff to show that (1) she belongs to a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) she was treated less favorably than similarly situated employees outside of her protected class. *Id.* (referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the plaintiff makes this initial showing, the burden shifts to the employer to show nondiscriminatory reasons for the decision. *Igasaki v. Ill. Dept. of Fin. and Professional Regulation*, 988 F.3d 948, 957 (7th Cir. 2021). The third and final step is the opportunity for the plaintiff to disprove the nondiscriminatory reason as pretextual. *Id.* The second method is the holistic evaluation of *Ortiz*, in which the plaintiff must show that the adverse employment action would not have happened to her if she had a different sex and everything else had remained the same. *Id.* (citing *Ortiz v. Warner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)). In performing this holistic analysis, the Court places all the available evidence, direct and circumstantial into a "single pile" and "evaluate[s] it as a whole." *Ortiz*, 834 F.3d at 766.

Under either of these standards Ms. Williams' claim suffers from a failure of proof and Parkview is entitled to summary judgment. Ms. Williams alleges her placement on a PIP, exclusion from the RCA, and her termination were on the basis of her sex. In the previous section of this order, the Court explained how Ms. Williams failed to show that her placement on a PIP or exclusion from the RCA were on the basis of her sex.[19] That reasoning applies with equal force here. Consequently, the only issue left to decide is whether Ms. Williams' termination was on the basis of her sex.

Applying the *McDonnell-Douglas* framework, Ms. Williams claim fails because she has not identified a single similarly situated male employee who received better treatment. Failing to point to even a single comparator is grounds for granting summary judgment. *Igasaki*, 988 F.3d at 952–54.[20] In order to establish a *prima facie* sex discrimination claim, a similarly situated employee must be "directly comparable" to the plaintiff in all "material respects." *Id.* at 958 (citing *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). This requirement includes that the coworkers engaged in comparable rule or policy violations. *Patterson*, 589 F.3d at 365–66. Typically whether an employee is similarly situated is a question for the finder of fact, unless the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue. *Igasaki*, 988 F.3d at 958.

Generally, the plaintiff is required to show that the two employees (1) dealt with the same decisionmaker, (2) were subject to the same standards, and (3) had engaged in similar conduct

---

[19] The Court would also incorporate its prior analysis on why Ms. Williams has not shown that her "intimidating meeting" with Parkview officials was on the basis of sex, even though it is unclear if Ms. Williams is arguing that event was part of her sex discrimination claim.

[20] The lack of a proper comparator would also foreclose Ms. Williams' sex discrimination claim even if the Court also considered the RCA and PIP placement for this claim as she has not identified a comparator for either of those acts.

without differentiating circumstances that would distinguish their conduct or the employer's treatment of them. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (internal citations and quotations omitted). That said, the Seventh Circuit has cautioned these requirements are not a "magic formula" and the similarly situated inquiry should be a flexible consideration of all the facts in the case. *Id.*

Ms. Williams argues that Dr. Winther is a similarly situated employee and that he was comparatively treated better because he was not placed on a PIP or terminated despite his sexually harassing behavior. The Court disagrees and finds that given the facts of this case, Dr. Winther cannot serve as a comparator and Parkview is entitled to summary judgment.

To begin, Dr. Winther and Ms. Williams did not have a common employer, let alone a common direct supervisor. Ms. Williams was an employee of Parkview and Dr. Winther was an employee of Professional Emergency Physicians. The decision to place Ms. Williams on a PIP and ultimately to terminate her was made by her immediate supervisor, Ashley Wirges. It is unclear from the record who had disciplinary authority over Dr. Winther, but the record does indicate that the recommendation for his admitting privileges to be revoked was made by Kim Harris, a human resources consultant for Parkview. (DE 27-3 at 3–4.) The record also reflects Ms. Wirges lacked disciplinary authority over Dr. Winther. (DE 20-3 ¶ 8.) The inference of a discriminatory motive is weaker when there are different decision-makers, since they "may rely on different factors when deciding whether, and how severely, to discipline an employee." *Coleman*, 667 F.3d at 847 (quoting *Ellis v. United Parcel Serv.*, 523 F.3d 823, 826 (7th Cir. 2008)). As such, this weighs against finding Dr. Winther to be a comparator.

Next, Ms. Williams and Dr. Winther were not subject to the same set of standards. While both were subject to Parkview's Anti-Discrimination Policy, Ms. Williams was also a supervisor

which gave her distinct obligations under that policy and related to her other roles. For example, under the Policy Ms. Williams was obligated to receive reports of misconduct from her employees and elevate them to human resources. Apart from the Policy, Ms. Williams was also responsible for ensuring her staff's performance of their duties such as implementing the remedial action plan. Nothing in the record reflects Dr. Winther held such supervisory responsibilities. This is important because Parkview does not claim they fired Ms. Williams for engaging in sexual harassment. They claim she was fired because of the poor quality of her work. Precedent dictates that in cases "[w]here the issue is the quality of a plaintiff's work, a difference between the plaintiff's and comparators' positions can be important because this difference will often by itself account for the less favorable treatment of the plaintiff." *Coleman*, 667 F.3d at 849 (citing *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) ("the comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories")). This also weighs against Dr. Winther serving as a comparator.

Finally, the Court comes to whether Ms. Williams and Dr. Winther engaged in similar conduct. The comparators need not have engaged in identical conduct to qualify as similarly situated, rather their conduct need only be "similar." *Coleman*, 667 F.3d at 850. For example, it is generally sufficient for the comparator to have violated the same rule as the plaintiff in an equally serious or more serious manner. *Id.* at 850. While this is not a restrictive standard, Ms. Williams cannot satisfy it here. Her alleged misconduct is poor work performance in leading and managing her subordinates but Dr. Winther allegedly sexually harassed coworkers. These actions are not similar enough to allow a meaningful comparison.

Ms. Williams's arguments to the contrary are unavailing. Ms. Williams' arguments rely on heavily generalizing her and Dr. Winther's roles and actions. Specifically, she frames them both as employees in the Emergency Department, subject to the same hospital standards such as the Anti-Harassment Policy, with the same job duties of caring for patients. These arguments are unpersuasive as they wave away important distinctions in the two individuals' job roles which impacts what standards they were subject to, the fact they dealt with different decisionmakers, and the fact the engaged in fundamentally different types of conduct. Thus, the Court concludes that Ms. Williams has not identified a similarly situated employee as required by the *McDonnell-Douglas* framework.

In considering the evidence holistically, the Court reaches the same conclusion. Ms. Williams testified in her deposition that she believes the negative things which happened to her at work were on account of her sex. However, Ms. Williams has not provided any evidence beyond that testimony that her sex was a motive for her exclusion from the RCA, her placement on a PIP, or her ultimate termination. Therefore she has not established a *prima facie* case which can survive summary judgment. *See Jones v. Parkview Hosp. Inc.*, 2020 WL 6291462, *12 (N.D. Ind. Oct. 26, 2020) (subjective beliefs and conclusory allegations are not evidence of discrimination) (internal citations omitted).

The Court finds Ms. Williams' claim does not satisfy the first step of the *McDonnell-Douglas* framework, and also fails under the holistic *Ortiz* framework, as she has not shown the adverse actions she experienced were on account of her sex. As such, Parkview is entitled to summary judgment on Count III.

**(4)** ***Ms. Williams' Title VII retaliation claim is sufficient to survive summary judgment (Count IV)***

Ms. Williams' fourth claim is for retaliation under Title VII. Ms. Williams alleges that Parkview terminated her in retaliation for encouraging her coworker Angela Jacobs to report Title VII violations. Parkview argues they are entitled to summary judgment because Ms. Williams was terminated due to her poor job performance and not on account of any communications with Ms. Jacobs. The Court agrees with Ms. Williams and will deny summary judgment.

For her retaliation claim to survive summary judgment, Ms. Williams must produce evidence that (1) she engaged in statutorily protected activity, (2) a materially adverse action was taken against her by her employer, and (3) there is a causal connection between (1) and (2). *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022). In this case the parties do not dispute that Ms. Williams' termination qualifies as a materially adverse employment action, nor do they explicitly dispute that she engaged in protected activity.[21]

A plaintiff establishes a causal connection by showing that the defendant "would not have taken the adverse … action but for [her] protected activity. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)). A plaintiff may establish this causal relationship through the direct method, or the indirect method. *Id.* The direct method being evidence such as an admission by an employer of an unlawful aim, and the indirect method being an inference assembled from the evidence in the record that it is more likely than not that discrimination lay behind the adverse

---

[21] Parkview's reply brief may, for the first time, dispute whether Ms. Williams' activity qualifies for Title VII protection. The Court will address this issue later in this order.

action.[22] *Id.* Regardless of the method being used, the fundamental obligation of the Court is to examine all evidence in the record and determine whether a reasonable jury could conclude that a plaintiff's protected activity caused her to suffer an adverse employment action. *Lesiv*, 39 F.4th at 918 (citing *Ortiz*, 834 F.3d at 765).

Ms. Williams does not specify what theory she is proceeding under and instead generally argues that the evidence is sufficient for a jury to infer causation. In the end, the question of what specific framework Ms. Williams is proceeding under is mooted by the fact there is sufficient evidence in the record for a reasonable juror to conclude Ms. Williams was terminated based on her protected activity.

The Court agrees with this assessment. The Court reaches this conclusion for three reasons. First, Parkview admits to knowing about Ms. Williams' protected activity when they chose to terminate her. Second, Ms. Williams' termination was only a week after her protected activity, which under these circumstances is sufficient to infer causation. Third, there is a genuine dispute of material fact over whether Parkview's stated reason for Ms. Williams termination was pretextual.

Ms. Williams argues that her termination was in retaliation for encouraging Ms. Jacobs to file a report about her allegedly hostile work environment. Ms. Williams alleges that within one week of encouraging Ms. Jacobs, she was terminated. Parkview has admitted, and evidence in the record shows, they were aware of Ms. Williams speaking with Ms. Jacobs prior to deciding to terminate Ms. Williams. This includes Ms. Wirges receiving a phone call from Ms. Goldsberry, the Vice President of Parkview Noble, informing Ms. Wirges of the contact and

---

[22] While the indirect method is often assessed using the *McDonnell-Douglas* burden shifting framework, neither party has invoked that framework here. Accordingly, the Court will perform the wholistic analysis of the record as discussed in *Lesiv.*

reporting that Ms. Williams was "shit stirring." (DE 20-3 at ¶ 29.) Ms. Wirges' personal notes of the call also indicate that the overarching theme of Ms. Williams conversation with Ms. Jacobs was "I see how you are being treated and it's not right" and that Ms. Williams conveyed she was going to file something with corporate and the manager could join her in filing. (DE 27-9 at 3.)

This evidence is enough to allow Ms. Williams' retaliation claim to survive summary judgment. Particularly, the evidence shows that Ms. Wirges was aware of Ms. Williams approaching managers at Whitley and seemingly encouraging them to join her in filing a grievance with the corporate office *before* Ms. Williams was terminated. *See Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512–13 (7th Cir. 2021) (a plaintiff must establish the decision maker had actual knowledge of the protected activity) Further, for the reasons discussed there is a question of material fact as to whether Ms. Williams was performing her duties according to expectations when she was terminated.

Ms. Williams also argues that the temporal proximity of her conversation with Ms. Jacobs and her termination shows she was terminated based on that protected activity. The Seventh Circuit has cautioned that "suspicious timing is rarely enough to create a triable issue." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021) (quoting *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). To prevail on such an argument the plaintiff is also required, as "a threshold matter" to show that the defendant was aware of the protected conduct. *Id.* (internal quotations and citations omitted). Further, generally only a few days may elapse between the protected activity and the adverse action in order to infer causation. *Id.* at 578–79; *see also Kidwell v. Eisenhower*, 679 F.3d 957, 966–67 (7th Cir. 2012) (discussing cases which found one-to-three-day gaps were sufficiently close, but a two-month gap was not);

*Rowlands v. United Parcel Serv.-Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (finding that a one-month gap to be sufficiently close when there was evidence of pretext for the termination).

The Court finds that *Rowlands* is dispositive guidance here for two reasons. First, the record shows Parkview was aware of Mr. Williams' protected activity. Second, as will be discussed below, there is objective evidence of pretext for the termination because there is a genuine dispute of material fact over whether Parkview's reason for termination is genuine. In *Rowlands*, those facts meant that one month between the protected activity and termination was close enough to infer causation and survive summary judgment. Here, the time span is only a week.

Parkview argues they are entitled to summary judgment because they have offered evidence of Ms. Williams' poor job performance as a legitimate reason for her termination, and she has not provided evidence establishing Parkview's rationale was pretextual. Parkview also argues that Ms. Williams has provided no admissible evidence that Ms. Jacobs *actually reported* a hostile work environment to her supervisors or Parkview human resources. Thus, Parkview argues, the only fact supporting the retaliation argument is temporal proximity between Ms. Williams encouraging Ms. Jacobs to file a report and being terminated, proximity which is not close enough to survive summary judgment.

The Court disagrees and finds there is a genuine dispute of material fact as to whether Ms. Williams' termination was pretextual. Parkview has mustered evidence that her job performance was declining before her termination. Specifically, the reports of poor performance that Ms. Wirges received from Ms. Williams' coworkers. That said, this is contradicted by other evidence from the same general time period that Ms. Williams was a good employee. Specifically, the Court would refer to her annual evaluation completed in July 2019 which

44

positively reports on Ms. Williams workplace performance and the 2019 Coworker Engagement Survey results.[23]

Pretext is not just "faulty reasoning or mistaken judgment" by an employer. *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023) (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017)). Rather it is a "lie, specifically a phony reason for some action." *Id.* The pretext inquiry accordingly requires the Court to evaluate the honesty of the employer's explanation, rather than its reasonableness. *Id.* To demonstrate pretext a plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions [in the employer's stated rationale] that would permit a reasonable person to conclude that the stated reasons are unworthy of credence." *Id.* (quoting *Robertson v. Dep't of Health Servs.*, 949 F.3d 37, 380 (7th Cir. 2020) (modifications omitted)). A plaintiff's contention that the employer's reasons are pretextual must be corroborated by some objective evidence and cannot rely solely on her subjective impression. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir. 1997).

Parkview's proffered reason for terminating Ms. Williams is her poor job performance, particularly relating to her ability to lead her staff and implement new policies as a result of the EMTALA event. Ms. Williams has mustered objective evidence that during the tenure of her employment she received positive performance evaluations, including an annual performance evaluation finalized shortly before her placement on a PIP. *See O'Connor*, 123 F.3d at 670. The Court recognizes that the fact Ms. Williams was placed on a PIP prior to engaging in her Title

---

[23] Ms. Williams does not quite explain how to read the results of the Coworker Engagement Survey, nor does she clarify whether all the questions are actually an appraisal of her leadership. (*See* DE 26 p. 37–38, Response ¶ 122 (claiming the survey shows "Plaintiff is above the Parkview mean in every category of evaluation" even though several prompts appear to be about non-managerial coworkers (*See, e.g.*, DE 27-20 at 8 ("The nurses I work with are clinically competent")). Nonetheless, the survey does appear to contain positive results regarding Ms. Williams leadership as a manager. (DE 27-20 at 10 (reflecting an above mean score for the prompt "My manager is an effective advocate for staff nurses.")

VII protected activity weighs against finding pretext. *Crain*, 63 F.4th at 594–95 (evidence of the employer raising performance issues prior to the protected activity undermines a conclusion the performance issues were pretextual). However, the parties agree that Ms. Williams and Ms. Wirges had productive meetings regarding the progress of the PIP which is indicative Ms. Williams was adequately satisfying her employer's progress requirements.

Viewed cumulatively, this evidence creates an inconsistency about the quality of Ms. Williams' job performance leading up to her termination which would allow a reasonable jury to conclude Parkview's stated reasons were unworthy of credence. Therefore, a reasonable jury could conclude from this evidence that Parkview's stated reason for Ms. Williams' termination was pretextual and she was actually terminated based on her protected activity.

This conclusion is buttressed by Seventh Circuit precedent. A portion of Parkview's stated rationale for terminating Ms. Williams appears to be a charge of insubordination or disloyalty related to her alleged formation of a "coalition" against management. The Seventh Circuit has held that an employer cannot retaliate against employees who complain of Title VII violations "'under the ruse that the employee was being disloyal or insubordinate by opposing unlawful activity.'" *Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 355 (7th Cir. 2023) (quoting *Castro v. DeVry Univ.*, 786 F.3d 559, 569 (7th Cir. 2015)). The Court interprets this precedent as advising caution in resolving summary judgment motions that turn on distinguishing unprotected insubordinate conduct from protected opposition to unlawful activity. As applied to this case, given there is evidence suggesting possible multiple motives for Ms. Williams' termination it should be left to a jury to determine which motives drove the decision.

Given the mixed evidence there is a genuine dispute of material fact which must be submitted to the jury to resolve, and summary judgment is inappropriate. *Xiong*, 62 F.4th at 355

("If an adverse employment action is the result of two different causes—one prohibited by Title VII and the other permissible—then summary judgment should not be granted to an employer. …. It is up to the jury, not a court at summary judgment, to unravel the competing, and perhaps intertwined, narratives as to why [the employer] decided to take that action.").

Parkview's reply brief also appears to raise the new argument that encouraging a coworker to file a report of conduct prohibited by Title VII is not a protected activity and this is a separate basis to grant them summary judgment. Parkview does not dispute that Ms. Williams' encouraged Ms. Jacobs to report misconduct or that they were aware of this encouragement when they chose to terminate her. But Parkview argues that "Plaintiff has not provided any admissible evidence that *Ms. Jacobs ever reported to anyone* at Parkview… that she was the victim of sexual harassment or a hostile work environment." (DE 30 at 9 (emphasis added).) The thrust of this statement seems to be Ms. Williams' encouragement is not protected activity unless Ms. Jacobs actually filed a complaint.

First, it is improper to raise new arguments in a reply brief and this argument is consequently waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond" ). Second, Parkview's assertion is unsupported by citation to legal authority and this Court has previously found encouraging coworkers to exercise their Title VII rights is protected activity. *Oszust v. Town of St. John*, 212 F. Supp. 3d 770, 777 (N.D. Ind. 2016) (plaintiff's actions of supporting, assisting, and encouraging three female coworkers in reporting sexual harassment is "squarely within" Title VII protected activity) (internal citations omitted).

Accordingly, the Court will deny Parkview's motion for summary judgment on Count IV as the evidence, when viewed holistically, would allow a reasonable juror to conclude that Ms. Williams's protected activity was the cause of her termination.

**E. Conclusion**

Accordingly, the Court DENIES as moot the Defendants' motion to strike. (DE 32.) The Court GRANTS in part and DENIES in part Defendants' motion for summary judgment. (DE 20.) The Court GRANTS summary judgment to Parkview on Count I (hostile work environment), Count II (sex discrimination), and Count III (HIPAA and EMTALA retaliation) but DENIES summary judgment on Count IV (Title VII retaliation)

SO ORDERED.

ENTERED: September 18, 2023

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court